## REMINGTON RAND BUSINESS SERVICE, Inc., v. ACME CARD SYSTEM CO.
### No. 3603.

Circuit Court of Appeals, Fourth Circuit.
June 11, 1934.

Edwin T. Bean, of Buffalo, N. Y. (Bean & Brooks, Richard W. Treverton, and Barton A. Bean, Jr., all of Buffalo, N. Y., and John H. Skeen, of Baltimore, Md., on the brief), for appellant.

William F. Hall, of Washington, D. C. (J. Kemp Bartlett, of Baltimore, Md., and Lee J. Gary, of Chicago, Ill., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and WAY, District Judge.

SOPER, Circuit Judge.

This case involves three patents relating to listing devices or visible index systems which are used in business offices and other institutions where it is important to have immediate access to information which otherwise would be accumulated in files. There are two patents to Powell in suit; No. 1,594,-112, for an index strip sheet granted July 27, 1926, upon an application filed July 14, 1922, and No. 1,683,207, for an index strip, granted September 4, 1928, upon an application filed July 2, 1926, as a division of the last-mentioned application. The third patent in suit, No. 1,394,231, was issued to Soans on October 18, 1921, on an application filed May 28, 1914, upon a device for holding index strips.

The index strips disclosed in the Powell patents are marketed under the name "Flexoline" and are designed for the convenient handling of data contained in a single line or two, when it is important that a large number of such records shall be immediately available for instant inspection, and yet be subject to easy change by substitution or elimination. The Soans patent relates to a panel to support these index strips in such a position that they may be seen readily and quickly.

A preliminary question in the case concerns the dismissal by the District Court of a motion made by the defendant to dismiss the plaintiff's bill for lack of jurisdiction, on the ground that the defendant had no regular and established place of business, and had not committed any act of infringement of the patents named in the district of Maryland. Section 48 of the Judicial Code, 28 USCA § 109, confers jurisdiction upon the District Courts of the United States in suits for the infringement of letters patent in the district of which the defendant is an inhabitant, or in any district in which the defendant shall have committed acts of infringement and shall have a regular and established place of business.

Remington Rand Business Service, Inc., the defendant in the District Court, is a Delaware corporation which has its principal place of business at Buffalo, N. Y. It has been engaged in the business of selling a general line of office equipment, machines, and supplies; it has operated an office and salesroom at 130 West Fayette street, Baltimore, Md., for more than five years prior to the institution of the pending suit under the supervision of a regional sales manager for the sale of products sold by the defendant; the Baltimore office has been under the control of a zone sales office of the defendant in New York City, where, with the exception of a register of orders, the books of account of the business done in Baltimore have been kept; a stock of goods has been kept on hand in the Baltimore store, and orders have been there solicited subject to approval and acceptance by the New York office, and in addition sales have been made in the Baltimore store without communicating with New York if the credit of the proposed purchaser is good. In addition to the regional sales manager, an office manager has had charge of the inventory of the goods in the Baltimore store, and one or more floor salesmen have been employed. Amongst other articles which the defendant sells is one called "Lignodex," consisting of index strips, which are charged to infringe the Powell patents. None of this article has been kept for sale in Baltimore, but it has been in use by the Chesapeake & Potomac Telephone Company in that city in connection with frames furnished by the defendant and charged to infringe the Soans patent. These goods had been sold to representatives of the telephone company outside the state, and had been furnished for use therein. The frames sometimes got out of order, and, when this occurred, it was the practice of the Baltimore office to render service to restore them to good condition.

We think it must be said, from this recital of the facts, that the defendant has maintained in Maryland a regular and established place of business. It is true that the express terms of the statute import something more than the mere doing of business in the district, and that the mere maintenance of an office from which orders may be solicited and forwarded to the home office in another state, followed by the shipment of

goods direct, does not constitute a regular and established place of business within the meaning of the act. Tyler Co. v. Ludlow-Saylor Wire Co., ·236 U. S. 723, 35 S. Ct. 458, 59· L. Ed. 808; Winterbottom v. Casey (D. C.) 283 F. 518. See, also, authorities cited in Elevator Supplies Co. v. Wagner Mfg. Co. (D. C.) 54 F.(2d) 937. Here we have,. however, not merely the solicitation of orders; subject to the approval of the home office, but also the maintenance of a stock of goods and sales therefrom to responsible customers without prior reference to the home office; and, in addition, employees who serve customers by keeping in proper working order merchandise purchased from the defendant. Considering that this place of business has been long operated under a resident sales manager, we think that the terms of the statute are satisfied.

■ It is also clear that infringement of the patents in suit took place in Maryland prior to the beginning of the litigation. After the institution of the suit, articles infringing the patents were sold for cash to a customer who had placed an order at the instigation of the plaintiff. The order called for goods similar to those then in use by the telephone company in Baltimore. The telephone company's equipment had been purchased from the defendant outside the state prior to the suit, and had been thereafter used by the telephone company in the state. There was no proof of local manufacture or sale by the defendant prior to suit; but there was proof that the defendant had contributed to prior local use of the articles by the telephone company by rendering service through its Baltimore office in keeping in repair the frames in which the index· strips were inclosed and made available. It is admitted that the index strips of the telephone company infringe the Powell patent, and it will be hereafter shown that the frames infringed the Soans patent. The servicing of the frames, by keeping them in good repair, not only aided in the use of the frames themselves, but in the use of the index strips which they were especially designed to hold, and it follows, in our opinion, that the defendant contributed to the infringement of all the patents which the use of the articles in Maryland necessarily involved.

The defendant relies in this connection on the decision in Gillette Safety Razor Co. v. Standard Razor Corp. (C. C. A.) 64 F.(2d) 6, where the rule was applied that it is not infringement to replace in a patented combination unpatented components which wear out with relative quickness. That rule, however, has no relevancy to the case of one who, having furnished an infringing device, contributes to its use by keeping it in condition so that it may more efficiently serve the user.

The two Powell patents, Nos. 1,594,112 and 1,683,207, relate to flexible index strips adapted to be used in a panel or frame. The latter structure is more fully described hereafter in the discussion of the Soans patent. The first Powell patent, No. 1,594,112, discloses a plurality of strips joined together at their edges so as to make a continuous sheet which may be placed in a typewriter to have the desired information printed thereon, and which may then be separated into individual strips for mounting upon the panel or frame. The strips in continuous sheet form are composed of a ply of thin wood veneer, to each side of which is secured a sheet of paper, and the whole is transversely scored by lines separated from one another by the width of an individual strip. The scoring runs the full width of the sheet, and extends entirely through the top facing sheet of paper and the wood veneer, leaving the backing sheet intact. The sheet can be used in a typewriting machine and written upon like an ordinary sheet of paper, because the material can be curved about the platen of the machine and the desired record can be written upon each strip while it lies in firm contact with the platen. Thereafter the sheet may be separated along the scored lines into individual index strips or into groups of strips at any time when it may be desirable to do so. Index equipment of this kind is customarily inserted in a frame or panel by extending the ends of the strips under marginal flanges on the panels, and the panels are mounted on rotary standards so that the panels can be turned over like the leaves of a book and the indexed information made· readily available.

Claims 1 and 6 of this patent, which are involved in this suit, are as follows:

"1. Flexible index strips in continuous. sheet form, comprising wood veneer faced and backed with paper and partially scored in the direction of their depth, thus permitting subsequent separation into individual resilient index strips."

"6. Flexible index strips in continuous. sheet form, comprising a thin body portion of wood faced and backed with paper and scored through one paper surface and through the wood surface, leaving the paper upon the opposite surface intact, thus permitting subsequent separation into individual resilient. index strips."

It is contended by the defendant that the Powell patents are invalid because long before the date of invention index strips of the same general shape and size, adapted for the same purpose, were in general use. It is admitted that wood veneer had never been used prior to the invention in the composition of the strips; but it is said that the substitution of this material did not amount to invention in view of its use in the art for other purposes. It was held by the District Judge that when the evidence in regard to prior art patents is summarized, the most that is disclosed is that the use of paper, cardboard, fiber, celluloid or other composition materials, scored as are the strips in the Powell patent, and used for the same purpose, was well known; but that there is no evidence that wood veneer was ever used for the purpose in view, or scored so as to adapt it to the end in view. We think, upon an examination of the evidence, that this summary fairly represents the situation.

The state of the prior art is shown by certain patents to James H. Rand, who seems to have been one of the pioneers in the visible index field and an engineer and inventor of recognized standing therein. His patents are the chief reliance of the defendant to support the claim of invalidity of the Powell patents in suit. A patent to J. H. Rand, No. 1,185,-538, was issued on May 30, 1916, upon an application filed December 10, 1914. It embodied an invention which had the greatest practical commercial success prior to the disclosure by Powell of his strips of wood veneer, and it was marketed by both parties to this suit. This patent called attention to the difficulty which had been experienced in typing the desired index data on strips and inserting them in large groups into an index panel. Such strips were usually made of heavy paper or cardboard relatively long and narrow. They could be inscribed by hand without difficulty, but, when typewritten, it had been necessary either to use some form of special typewriter attachment, or to type the index titles in a column on a card sheet large enough to go into the typewriter in the usual way and then to cut the sheet into strips, each containing one index title. In furtherance of the latter practice, it had been proposed to perforate or score the sheet in parallel lines; but this left ragged edges endangering the strips in separating them, and took time. To meet this difficulty the patent contemplated the formation of a sheet of index strips arranged lengthwise, edge to edge, and held in that relation by connecting to the rear face of the strips two adhesive fabric tapes close to the opposite side edges of the sheet. Thus a flexible sheet was formed which could be bent into an ordinary typewriter, and after the subject-matter of the index had been printed on the strips, the sheet was laid face down and the binder adhesive strips were pulled off. The index strips were made of long narrow pieces of paper cardboard or other suitable material. When a temporary index was needed, the index strips were mounted in the panel; but when a more permanent index was desired, the strips before being mounted were inserted in tubular sheaths of celluloid in order to preserve them.

The disadvantages of this device, as compared with the flexible wood veneer strips of the Powell patent, are obvious. Rand himself attempted improvements in later inventions, one of which is covered by patent No. 1,462,497 issued July 24, 1923, on an application filed May 19, 1921. It is said by the defendant here to approximate the Powell patent, No. 1,594,112, more closely than any other patent cited. It is important in devices of this character to secure a smooth surface and perfect alignment of the strips in the holder, so that they shall lie flat against the web of the holder and shall not be deformed in bending. Rand recognized this fact in his later patent, which he said made it possible to provide narrower index elements than had theretofore been practical, and also to insure a flat even surface of the assembled series of index strips free from irregular or individual projecting strips when the strips are mounted in the frame, side by side. In order to accomplish this effect, Rand made use of a sheet of resilient material adapted to take and retain a curved or bowed form. He used a two-ply sheet, of which the front ply consisted of a transparent sheet material, such as celluloid, and a rear ply consisting of paper that could be written upon; the two plies being adhesively secured by clear and transparent cement. The strip was curved or bowed in a rearward direction so that the body of the strip would lie flat against the flat surface of the frame when the ends of the strip were held down by the retaining flanges of the frame. The purpose was, through pressure exerted at the three points at which the strip came in contact with the frame and retaining flanges, to secure an even, flat, and substantially continuous front surface. After the complete sheet was written, some provision had to be made for cutting the composite sheet into individual index strips, and it would seem that the introduction of any strip into the panel

was obliged to await the recording upon the sheet of all the data it was intended to receive.

There is no evidence that this invention was ever employed commercially, and it is obvious that it did not present the advantages which the Powell invention disclosed. Powell also contemplates the use of a cheap and efficient material which will take print readily and present a smooth uniform face to the indexing frame. The continuous sheet of strips can be placed in a typewriting machine like an ordinary sheet of paper so as to receive the record, and can thereafter be separated by hand clearly along the scored lines. The strips obtained are perfectly straight and lie flat against the retaining panel. They can be bent in the middle so as to insert or remove them from the panel without requiring the removal of adjacent strips, and they possess sufficient resiliency so that when released from the flexing they snap back into place. Moreover, the strips are of a durable character and do not need, like cardboard, the protection of a celluloid carrier.

Other patents to Rand, to wit, No. 1,025,997 of May 14, 1912, and No. 890,925 of June 16, 1908, may be mentioned, but they do not tend to show the invalidity of the patent in suit. In No. 890,925, it was attempted to avoid the buckling of the individual strips when inserting them in the frame, and in No. 1,025,997 it was pointed out that the customary cardboard strips became quickly broken, soiled, or otherwise disfigured, necessitating their replacement, and it was provided that the strips be enclosed in sheaths of celluloid so that they would not fall out of the display panel.

■ It is significant that in the early part of 1921, both Rand and Powell were endeavoring to solve the difficulties which affected the articles then in use. Rand's patent, No. 1,462,497 was applied for on May 19, 1921. Powell was working on the problem in February of that year, and the articles disclosed in his patent in suit were put on the market as early as October, 1921, under the name of "Flexoline." The evidence shows that it was a marked success, and that it is now being sold throughout the United States and in many foreign countries. It has largely displaced the devices heretofore use, and it has been adopted by the defendant company in its business and marketed under the name of "Lignodex." This history is persuasive, for Rand, who is well described as a "man skilled in the art," failed to obtain the ex-

cellent results which Powell achieved. We have no difficulty in approving the conclusion of the District Judge that Powell's discovery amounted to invention. The decisions of the Supreme Court and of the several circuits are replete with illustrations of similar situations in which it has been held that one who in the practical application of an art has found that which eluded the search of other skilled men is entitled to the grant of a patent. Diamond Rubber Co. v. Consolidated Tire Co., 220 U. S. 428, 434, 31 S. Ct. 444, 55 L.Ed. 527; United States Industrial Chemical Co. v. Theroz Co. (C. C. A.) 25 F.(2d) 387; Gulf Smokeless Coal Co. v. Sutton, Steele & Steele (C. C. A.) 35 F.(2d) 433; Julius Levine & Co. v. Automatic Paper Machinery Co. (C. C. A.) 63 F. (2d) 547; Wahl Clipper Corporation v. Andis Clipper Co. (C. C. A.) 66 F.(2d) 162; White Co. v. Converse (C. C. A.) 20 F.(2d) 311; Johnson v. Forty-Second Street, M. & St. N. Ave. R. Co. (C. C.) 33 F. 499, 501.

■ It is suggested, however, that the Powell patent is lacking in invention because instances may be found in the prior art of a material consisting of wood, faced and backed with paper that was used as a substitute for cardboard. For instance, in the British patent to Haddon, No. 5,442, of 1881, a material, called a substitute for the cardboard, was disclosed which consisted of a thin piece of wood covered on each side with a sheet of cardboard. It was said to be useful for making work boxes, trunks, traveling boxes, book covers, playing cards, tickets, and generally for all purposes where ordinary cardboard is used. Again United States patent No. 1,154,138, to Staley and Simmons, of 1915, called for a composition veneer and described the making of a sheet of wood veneer as a core with a covering of paper on each side. This also was designed to be used in shipping cases or boxes which would be inexpensive to manufacture and have a greater rigidity than the ordinary corrugated paper board box. So it is said that Powell merely substituted one known material for another in the composition of his strips. There is, however, no rule of law that the substitution of a new material for an old is not patentable. The question is always whether the alteration requires invention or merely the exercise of mechanical skill and judgment. The answer must be found in the light of the circumstances of the particular case, although decisions of the courts are helpful which attempt to summarize the facts of prior cases and to formulate general rules based thereon. See Low v. McMaster (C. C.

A.) 266 F. 518, 519; Wise Soda Apparatus Co. v. Bishop-Babcock-Becker Co. (C. C. A.) 240 F. 733. It has been held that if the substitution does not involve a change of method, nor develop novelty of use, there is no invention even though a superior article may result; and, on the other hand, that there may be invention if a new mode of construction is involved or new uses and properties of the article formed are developed. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 496, 23 L. Ed. 952; Hotchkiss v. Greenwood, 11 How. 248, 13 L. Ed. 683; Florsheim v. Schilling, 137 U. S. 64, 76, 11 S. Ct. 20, 34 L. Ed. 574; Celluloid Mfg. Co. v. Frederick Crane Chemical Co. (C. C.) 36 F. 110; In re Covey (Cust. & Pat. App.) 63 F.(2d) 982, 983; Danbury v. American Hatters (C. C. A.) 54 F.(2d) 344.

■ The Powell strips were designed to serve the same general purpose as those formerly known to the trade, but they accomplished this purpose by enabling a completed index strip in use to be made more easily and to serve more efficiently than had ever been done before. The writing of the information upon the strips in the typewriting machine, the clean separation of the written strips thereafter, the insertion of the strips in the frame and their removal therefrom at will, the maintenance of the strips in the frame in a smooth surface and alignment without any protective covering, each of these circumstances contributed to the success of the device, and, taken together, they may fairly be said to constitute uses and properties which no previous article had possessed. Considering that other persons of mechanical skill and judgment had failed to produce this result, we find invention notwithstanding the fact that wood veneer covered with paper or cardboard had been used for other purposes.

■ The second Powell patent, No. 1,683,207, issued September 4, 1928, upon an application filed July 14, 1922, we think is invalid for double patenting, since it covers the same invention as that disclosed in the first Powell patent. The drawings are identical and the descriptive parts of the specification are substantially the same. The fourth claim of this patent, which is typical, is as follows: "Separated flexible index strips comprising strips of wood faced and backed with paper."

This claim differs from the claims of the first patent only in that it refers to the separated strips while the first patent refers to the strips in continuous sheet form. However, since the first patent, both in the specification and in the claims, obviously contemplates the separation of the sheets into individual strips, the subsequent patent lays claim to an essential element of the first. The rule as to double patenting is clearly stated in Century Electric Co. v. Westinghouse (C. C. A.) 191 F. 350, 352, as follows: "An inventor, it is true, may not sustain a subsequent patent for an invention actually claimed and secured in a former patent. * * * Nor may he sustain a subsequent patent for an essential element of an invention secured by a former patent without which that invention would not have been patentable. * * * But one who makes several patentable inventions * * * may have as many separate valid patents as he makes patentable inventions. His is the option to secure all these inventions by a single patent, or by many patents, and the fact that he describes all of them in his application or specification for an earlier patent to secure one or more of them, does not invalidate a subsequent patent to him for those inventions there described but not claimed. * * * And a patent for an invention does not avoid a later patent for an improvement thereon nor does a patent for an improvement avoid a later patent for the invention on which the improvement is made. * * * The sum of the whole matter is that while an earlier patent avoids a later patent to the same patentee for the invention claimed and secured by the former it does not invalidate a later patent to him for a distinct, different and separable invention whether generic or specific, whether an original machine or process, or both, or an improvement thereon which is not actually claimed or secured by the earlier patent."

■ See, also, Gibbs v. Montgomery Ward & Co. (C. C. A.) 27 F.(2d) 466; Id. (D. C.) 19 F.(2d) 613. This situation was recognized by the District Court, but the patent was sustained because it was issued upon an application filed as a division of the application upon which the first patent was issued, and this was done at the suggestion or requirement of the Patent Office. It was thought that it would be inequitable to reject the patent, since the plaintiff was led to adopt this course by the Patent Office itself. The effect of such a holding, however, would be to extend the patent for an additional period, since the issuing date of the first patent was July 27, 1926, while the second runs from September 4, 1928. The patentee was not obliged to accept the ruling of the Patent Office, and may not lengthen the term of his

monopoly by the improper division of the patent which has resulted.

The patent to Soans, No. 1,394,231, was issued on October 18, 1921, on an application filed May 28, 1914, and renewed August 2, 1918. The structure consists of a thin flat central metal sheet or web, of rectangular form, which is provided with marginal members secured to its longitudinal side edges to serve as flanges to receive the ends of the index strips. Each marginal member consists of a single strip of sheet metal folded upon itself so that the outer end is enlarged and rounded into a cylindrical bead, while the opposite ends are spaced apart as parallel flanges. Between the flanges and the beads are depressed or indented sections, designed to embrace directly the marginal edge portions of the web and to be connected thereto rigidly in order to hold the marginal members in place. The ends of the index strips are inserted between the face of the web and the inwardly extending parallel flanges. The cylindrical bead at one side of the panel provides a pocket for receiving pintles by which the panel is connected to the support thereof. The bead on the opposite side of the panel may be used as a guide for a sliding indicator tab. The bead also provides a smooth rounded surface which guards the edge of the web which is preferably, but not necessarily, extended into the bead portion. Claim 1 of the patent, which is here relied on, is as follows: "1. In a holder for members adapted to be removably retained by springing their edge under a flange, the combination with a central web, of a marginal member secured to said web, said marginal member having depressed central portions engaging opposite faces of the web, a bead member adapted to inclose and protect the edge of the web and an inwardly extending offset flange spaced from the web to receive the end of a member to be held."

The only difference between this structure and that of Remington, which is claimed to infringe, is that in the latter the web does not extend into the bead portion. We think, as did the District Court, that this difference is unimportant, since the claim in suit is not limited to the preferable form or to the detail of having the extreme side edges of the web in contact with the outermost part of the inner wall of the bead. It follows that infringement is made out. It is conceded that the measure of any patentable invention involved in this construction is limited and slight, and to us it does not seem that invention is involved at all. Even without reference to the prior art, it may well be doubted whether anything more than mechanical skill was necessary to devise a plate, upon which the strips can be laid, with some means for holding them flat against its surface. Moreover, similar devices have been used for a long time. The patent to Rudolph, No. 499,-441 of June 13, 1893, is said by the plaintiff to approximate most closely in the prior art to the Soans patent. The only patentable difference alleged to exist in Soans is the shape of the marginal members that provide the flanges for retaining the ends of the index strips. The Rudolph patent related to improvements on indexes and files, consisting of a series of cards with a means of holding index slips upon them, and a box within which the cards were sustained. The index slips and the supporting cards in the Rudolph patent were not made available for inspection by being mounted upon pintles, but were filed away in the box; but the necessity for holding the index slips upon the cards, and the means of doing so, were quite similar to the device which Soans disclosed. In Rudolph the opposite longitudinal ends of the slips were held in place by reinforcing strips, and over these strips were fastened other strips which projected inwardly a little way over the first-named strips, thus forming channels into which the slips could be inserted. In other words, the marginal member in the Rudolph device was composed of two U-shaped members, one within the other, and with the longer one disposed inwardly to provide flanges spaced from the web for receiving the end of the flexible index strips. Soan's marginal member is formed of one piece of metal only, and doubtless is a preferable structure; but it seems to us merely the result of ordinary mechanical skill.

If there should be any doubt on this point, it is dispelled by the patent to Anchell No. 836,358, of November 20, 1906. Anchell's invention related to devices for exhibiting samples of lace, fabric, or the like, and consisted in a leaf or panel for displaying the sample, and marginal members with inturned flanges to receive the ends of the strips of goods to be displayed. The construction of the marginal members is substantially identical with that of Soans, with the slight point of difference (which likewise exists in the Remington structure), that the bead member did not inclose the web. This was an immaterial difference, as we have shown in discussing the question of infringement. The only answer suggested to this reference is that the Anchell structure was made of paper and hence would not fill the demands made upon frames designed to hold

visible index strips. It is not necessary, however, for the purpose in view, that the Anchell patent be considered a complete anticipation to the patent in suit. It is sufficient that it suggests to one interested in the problem the means of solving it. When we consider the result which Soans was striving to achieve, and note the comparative simplicity of the problem, it is clear that it did not require invention to solve it in view of the suggestions in the .kindred art contained in the Rudolph and Anchell patents. ·

We conclude that the first Powell patent was valid; that the defendant maintained a regular and established place of business in the district of Maryland, and infringed the patent therein prior to the institution of this suit; that the second Powell patent is invalid for double patenting; and that the Soans patent, although infringed, is invalid for lack of patentable invention.

The decree of the District Court is therefore affirmed in part, and the case remanded to the District Court for further proceedings in accordance herewith.

Decree modified, and case remanded for further proceedings.