36 C.C.P.A. (Patents)

Application of MAY et al.

Patent Appeals No. 5506.

United States Court of Customs and Patent Appeals.

Feb. 1, 1949.

·594

Pennie, Edmonds, Morton & Barrows, of New York City (Louis D. Forward, of New York City, Clarence M. Fisher, of Washington, D. C., Bryce Beecher, of Boston, Mass., and Roger T. McLean, of New York City, of counsel), for appellants.

W. W. Cochran, of Washington, D. C. (J. Schimmel, of Washington, D. C., of counsel) for Commissioner of Patents.

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Judges.

GARRETT. Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting as unpatentable over. prior art cited claims 1 to 8, .inclusive, of appellants' application, Serial No. 442,865, for patent for alleged new and useful improvements in chemical manufacture. No claims were allowed.

All the claims on appeal are for a process which is briefly described in the brief for appellants as follows (Record pages omitted as indicated by asterisks and italics quoted):

"The claims in appellants' application * * * are directed to a new and improved method of preparing a valuable secondary octyl ester of salicylic acid, known as 'capryl salicylate', wherein this product is prepared by reacting (1) methyl salicylate with (2) capryl alcohol; the reaction being accomplished *in the presence of either one of two specifically recited catalysts.* Methyl alcohol is produced as a by-product. The reaction is carried out in the absence of water (i.e., using anhydrous materials) and at a temperature such that the methyl alcohol which is formed as a by-product will be liberated as a vapor and .expelled from the zone of reaction as rapidly as formed.

"As is pointed out on the first page of appellants' specification * * *, the type of reaction here involved is generally designated 'alcohol exchange' or 'alcoholysis', since one of the raw materials is *one* particular alcohol (namely, capryl alcohol which is a secondary alcohol) while one of the ultimate reaction products is *a different* particular alcohol (namely, methyl alcohol which is a primary alcohol)."

The board states:

"The process claimed relates to the preparation of capryl salicylate by alcoholysis reaction from methyl salicylate and capryl alcohol using as a catalyst sodium methyl salicylate or sodium capryl salicylate."

In his official statement following the appeal to the board the examiner quoted all the claims. The board quoted only claim 2 as illustrative. Before us the Solicitor for the Patent Office selects and quotes only

claim 1, while the brief for appellants suggests the study of claims 1, 7, and 8, and we here reproduce them, the emphasized parts in each of them being quoted:

"1. In the process of preparing capryl salicylate by heating a substantially anhydrous mixture of capryl alcohol and methyl salicylate in the presence of a catalyst whereby the methyl radical of the ester is replaced by the octyl radical of the capryl alcohol and methyl alcohol is liberated and expelled from the zone of reaction substantially as rapidly as formed, *the improvement comprising using as the catalyst a sodium phenolate of the class consisting of sodium methyl salicylate and sodium capryl salicylate.*

"7. In the process of preparing capryl salicylate by heating a substantially anhydrous mixture of capryl alcohol and methyl salicylate in the presence of a catalyst whereby the methyl radical of the ester is replaced by the octyl radical of the capryl alcohol and methyl alcohol is liberated and expelled from the zone of reaction substantially as rapidly as formed, *the improvement comprising heating a mixture* of the capryl alcohol and the methyl salicylate, in which the molar ratio of the alcohol to the ester is about 1.75:1, *in the presence of sodium methyl salicylate* in a proportion about 0.05 mole per mole of methyl salicylate, at a temperature of about 350° F.

"8. In the process of preparing capryl salicylate by heating a substantially anhydrous mixture of capryl alcohol and methyl salicylate in the presence of a catalyst whereby the methyl radical of the ester is replaced by the octyl radical of the capryl alcohol and methyl alcohol is liberated and expelled from the zone of reaction substantially as rapidly as formed, *the improvement comprising heating a mixture* of the capryl alcohol and the methyl salicylate, in which the molar ratio of the alcohol to the ester is about 1.85:1, *in the presence of sodium capryl salicylate,* in a proportion about 0.05 mole per mole of methyl salicylate, at a temperature of about 350° F."

The rejection of the claims was based, first, upon a publication, pages 407 and 2274 to 2281, inclusive, by Rule et al., "Journal Chemical Society," London, 1929, alone, and, second, upon the so identified publication in view of a patent, No. 2,141,985, issued to one Walter E. Huggett, December 27, 1938.

The disclosure of the Rule et al. publication, as described generally by the Solicitor for the Patent Office, is that of "a method of preparing octyl salicylate by heating secondary octyl alcohol with methyl salicylate at a temperature between 266°–284° F.," the octyl alcohol having "dissolved therein a small amount of metallic sodium." The solicitor's brief states: "A slow current of air was drawn through the heated mixture thereby removing the methyl alcohol formed during the reaction. Pure octyl esters in yields varying from 20 to 40% calculated on the methyl ester are produced." In his statement following the appeal to the board the examiner said: "Capryl alcohol is a synonym for sec. octyl alcohol," and the board repeated the assertion in its decision.

The Huggett patent seemingly is cumulative as to the feature of removing methyl alcohol as rapidly as it is formed in the zone of reaction. This is a feature not relied upon before us. The brief for appellants states, in effect, that the allegation of error covering it is not relied upon. Another feature of the patent to which attention is called by the Solicitor for the Patent Office is the finding of the examiner that the patent "states that a sodium phenate may be formed by reacting sodium metal with a salicylic acid ester."

It is noted that the brief for appellants concedes that in their own application they "acknowledged" that the reaction here involved had been carried out prior to their application using metallic sodium as the catalyst.

It is conceded in the brief on behalf of appellants that all limitations which appear in claims 2 to 6, inclusive, that are not in claims 1, 7, and 8 add nothing to the patentability of the former group, and there is no occasion to discuss such limitations. As a matter of fact, claim 1, supra, seems to us to be generic to claims 7 and 8, supra, as is stated by appellants, and, further, we are of opinion that claims 2 to 8, inclusive, stand or fall with claim 1. In other words, if

claim 1 be patentable, all the other claims properly may be allowed, but if claim 1 be not allowable, there are no limitations in any of the other claims which render them patentable.

It will be observed that the concluding clause of claim 1, supra, specifies "the improvement comprising using as the catalyst a sodium phenolate of the class consisting of sodium methyl salicylate and sodium capryl salicylate," thus making it a claim of the Markush type, and in the brief for appellants it is said:

"* * * Appellants rest their contention as to the patentability of the appealed claims squarely on the ground that their discovery of the fact that a small amount of either (a) sodium methyl salicylate, or (b) sodium capryl salicylate, possesses the capability of effectively catalyzing the reaction between methyl salicylate and capryl alcohol to produce capryl salicylate, *is a valuable discovery that is nowhere suggested in the prior art.* (Italics quoted.)"

It appears that in the application as originally filed sodium caprylate was named in the specification and included in claims 1–6 (but not in claims 7 and 8) as a third ingredient, and the three—that is, sodium methyl salicylate, sodium capryl salicylate, and sodium caprylate—were defined, as stated by the examiner, "as members of an artificial Markush group, i.e. as equivalents."

After an early action by the examiner, the text of which does not appear in the record, appellants cancelled "sodium caprylate" from claims 1–6 and also substituted the word "phenolate" for the word "compound" originally used in each of the claims. The latter change apparently has no particular bearing upon the issue before us, but of the cancellation of "sodium caprylate" the examiner said in his official statement:

"* * * Despite the cancellation of the caprylate from claims 1–6, it still partakes of the common characteristics of the Markush group. Ex parte Burke, 1934 C.D. 5."

In this connection, see the decision of this court in the case of In re Ayres, 83 F.2d 297, 23 C.C.P.A., Patents, 1118, cited in the brief of the Solicitor for the Patent Office, and the decision of the Commissioner of Patents in the case of In re Dahlen, 1934 C.D.9, cited in the brief for appellants.

In the brief for appellants it is argued, in substance, that confusion has prevailed throughout the prosecution of the case relative to the patentability of the subject matter of the claims as they now read because of the original inclusion of sodium caprylate in the specification and in claims 1–6. The brief states, inter alia:

"* * * at the time when the present application was filed, appellants were satisfied (and still believe) that they had not only made an original discovery of the *previously unknown and unobvious capability* of sodium methyl salicylate and sodium capryl salicylate *to promote the alcohol exchange reaction here involved,* but that they also had made the additional original discovery that *still a third sodium compound,* namely sodium caprylate, was capable of catalyzing this alcohol exchange reaction with at least a reasonable degree of efficiency. (Italics quoted.)"

It is not unreasonable to surmise that some confusion might have been occasioned temporarily by appellants' inclusion of sodium caprylate in the specification and in claims 1–6 because, for one reason, their action in that respect indicated their belief at that time that sodium caprylate was an equivalent of sodium methyl salicylate and sodium capryl salicylate. Had they not so believed, it is not supposed that sodium caprylate would have been included as a member of the Markush group. Indeed, as appears from the last quoted expression of appellants' brief and from other arguments made before us, they still seem to believe that there was patentable merit in the sodium caprylate feature, although, as had been stated, they cancelled that ingredient from the claims following the early rejection, which seems to have been based upon the same prior art finally relied upon after the amendments had been entered.

It is conceded in the brief of the Solicitor for the Patent Office that "the Rule et al. publication does not disclose that either sodium methyl salicylate or sodium capryl

salicylate [the only elements now appearing specifically in the appealed claims] will catalyze the reaction described therein," and that the specific teaching of the reference is only "that a small amount of metallic sodium is dissolved in the octyl alcohol used." Nevertheless, the solicitor upholds the decisions of the examiner and the board, which, in the final analysis, are based upon the holding that each of the two ingredients specified by name in the claims is the equivalent of the metallic sodium disclosed by the reference publication and by the reference patent also.

We do not understand that the decisions below rested simply and solely upon the fact that appellants' specification discloses, and their claims 1–6 at one time claimed, sodium caprylate as a member of an artificial Markush group, and hence, in effect, conceded it to be the equivalent of the other ingredients, although that action on the part of appellants was strongly emphasized by the examiner, who was followed by the board. The Solicitor for the Patent Office also has emphasized it in the brief before us.

From a careful study of the respective decisions of the tribunals of the Patent Office, however, it is our view that the conclusion as to equivalency was reached independently of any implied concession on the part of appellants. We quote the following from the decision of the examiner (record pages being omitted as indicated by asterisks):

"It will be noted that the various catalysts are sodium compounds of the starting materials and final ester product, i.e., the sodium salts of methyl salicylate, capryl alcohol and capryl salicylate. Originally all three were claimed. After the cancellation of the caprylate, the sales of *one* starting material and the capryl ester are claimed. Apparently, the essential effect is produced by the presence of a small amount of combined sodium being present in the reaction and the same amount of sodium combined as a phenate as in sodium methyl or sodium capryl salicylate is the equivalent of the sodium in the caprylate. In view of the small quantities of catalysts used and the temperature conditions of the reaction, it is not seen that any difference between the catalysts could be detected in the reaction mixture whichever one is actually used.

"Sodium caprylate is therefore held to be an equivalent of sodium methyl salicylate and sodium capryl salicylate and because of this, claims 1–8 are unpatentable over Rule.

"Claims 1–8 are further rejected as unpatentable over Rule in view of Hoggett. The latter patentee shows an closely analogous alcoholysis reaction between a salicylic ester and phenol. As a catalyst he may use sodium phenate, the sodium compound of the salicylate ester which is the starting material, or the salicylic ester which is to be the product of the reaction. * * *

"No invention is seen in likewise using the sodium compounds of the starting methyl salicylate, or capryl salicylate which is the desired product in Rule, in view of Hoggett's teaching. (Italics quoted.)"

The foregoing, which was affirmed by the board, seems to us to be a clear cut finding of equivalency without reference to the actions and expressions of appellants, and we think there is no occasion to discuss such actions and expressions further, nor to review in detail the authorities cited in the respective briefs bearing upon certain phases of the practice under the Markush rule.

The simple issue, as we view it, is whether the holding of equivalency was erroneous. The burden rested upon appellants to demonstrate error, if error was committed.

Appellants have not introduced any evidence by affidavit or otherwise which controverts the statements of fact made by the examiner and approved by the board. Such findings of fact had been made by the examiner in different office actions occurring before the appeal to the board and appellants had ample opportunity to traverse the examiner's findings with competent proof if such proof was available; but this was not done, and appellants rely simply upon arguments as to alleged differences in chemical reactions. These arguments have been noted and considered.

It seems from the brief for appellants that in the rejection of the claims as originally drawn (the text of the rejection, as hereinbefore has been stated, not being of record) the examiner took the position, while discussing the Rule et al. publication disclosure, that by the time the capryl alcohol containing the dissolved metallic sodium had been brought into contact with the methyl salicylate in performing the operation, the sodium would already have reacted with the alcohol to form sodium caprylate. The brief for appellants asserts that this is a matter of conjecture since the reference did not state in terms that sodium caprylate was formed. Appellants, however, did not request the examiner to cite his authority for the statement, as they might have done, nor did they present any proof to the contrary. As a matter of fact, it seems from the decision of the board that before it appellants did not challenge the examiner's finding upon this point.

A second argument is that the Rule et al. publication contains no teaching that either sodium methyl salicylate or sodium capryl salicylate might be capable of functioning as a catalyst in the alcohol exchange action here involved.

This argument really does not go to the question of the equivalency of the two specifically named ingredients of the claims and the sodium caprylate disclosed by the reference. If the three are equivalents and have, as expressed in headnote 4 of the Burke case, supra, 'a community of chemical or physical characteristics recognized in scientific classification," it is immaterial that the publication did not expressly specify the teaching relative to the functioning of sodium methyl salicylate and sodium capryl salicylate.

Appellants' third argument is to the effect that forms of process using the two ingredients now specifically named in all the claims, and which are the only ones named originally in claims 7 and 8, are both distinguishable from and superior to the process disclosed in the Rule et al. publication irrespective of whether sodium caprylate would or would not be initially formed in the Rule et al. process as held by the examiner and the board.

The superiority is alleged to lie, first, in the alleged doubling, over the Rule et al. process, of the yield of desired capryl salicylate, and, second, in the use of the phenolates of the claims as catalysts by which, it is said, the use of metallic sodium as a catalyst is avoided. It is said that thus there is provided "for the first time a means of avoiding the fire and explosion hazard incident to the use of metallic sodium * * *."

It may be that the process for which appellants seek patent possesses advantages such as those claimed over the process of the prior art, but, as we view it, that does not establish the lack of equivalency—the all important matter here involved.

A fourth and final argument relative to alleged differences in chemical reactions, etc., is, in substance, that the ingredients specifically named in the claims are "aromatic compounds," while sodium caprylate "is a straight chain compound," (that is, as we understand it, an aliphatic compound) and it is asserted that the latter so differs from the former two, both as to structure and as to chemical behavior, "that it is questionable whether all three of these compounds ever could *properly* be included in a Markush group." (Italics quoted.)

Obviously this fourth argument is inconsistent with appellants' view at the time they filed the application involved, and it does not seem to be entirely consistent with the implications of the assertion hereinbefore quoted to the effect that they still believe that they had made an additional original discovery that sodium caprylate was capable of catalyzing the involved alcohol exchange reaction with at least a reasonable degree of efficiency.

However, we do not rest our decision upon appellants' implied concessions or apparent inconsistencies, no matter how persuasive they might be against their present position. We rest it upon their failure to refute the findings of fact by the tribunals of the Patent Office by proof instead of trying to refute them merely by argument.

We find nothing in the record which indicates that the fact that the catalyst ingredients now specifically named in the

claims are aromatic compounds while sodium caprylate is an aliphatic compound has any patentable significance here.

Appellants' application is in a highly technical field, or art. In considering cases of this character the court must depend in the first instance upon the findings of fact announced by the tribunals of the Patent Office, who are supposed to be experts in the art. It is, and long has been, the established rule that when an applicant fails to request the examiner's authority for any finding of fact by him which the applicant questions, as provided for by the Patent Office rules, or where the applicant fails to refute a finding by proof, and the examiner's finding is approved by the board, such finding of fact will be accepted as binding by this court. In re Lewis, 96 F.2d 1009, 25 C.C.P.A., Patents, 1273; In re Selmi et al., 156 F.2d 96, 33 C.C.P.A., Patents, 1187; In re Williford, 158 F.2d 997, 34 C.C.P.A., Patents, 812.

That rule is applicable here, and we abide by it.

It is unnecessary to lengthen this opinion by further analysis of the arguments made, nor is it necessary to say more of the Huggett patent than already has been said. We think it was good as a cumulative reference upon the points for which it was cited.

The decision of the board is affirmed.

Affirmed.